MARK GAILEY

FILED 15 MAY '26 10:59 USDC-ORE

2250 Beverly Street, Springfield, OR 97477

Telephone: 971-917-9416

Email: arrtprogram@gmail.com

AMANDA MICHELLE GAYHART

2250 Beverly Street, Springfield, OR 97477

Telephone: 541-799-7417

Email: amandalynngayhart33@gmail.com

*Plaintiffs, Pro Se*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| MARK GAILEY and AMANDA GAYHART, | Case No.: 6:26-cv-00782-AA |
|---|---|
| Plaintiffs, | **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| v. | |
| OPENAI FOUNDATION (formerly OpenAI, Inc.) and OPENAI OPCO, LLC, | **(JURY TRIAL DEMANDED — $500,000)** |
| Defendants. | |

Plaintiffs Mark Gailey and Amanda Michelle Gayhart, appearing pro se, allege as follows:

## I. PARTIES

1. Plaintiff Mark Gailey is an adult individual residing at 2250 Beverly Street, Springfield, Lane County, Oregon 97477.

2. Plaintiff Amanda Michelle Gayhart, age 43, is an adult individual residing at 2250 Beverly Street, Springfield, Lane County, Oregon 97477. Plaintiffs are, and were at all relevant times, engaged to be married and in a committed romantic relationship.

3. Defendant OpenAI Foundation (formerly OpenAI, Inc.) is a Delaware nonprofit corporation with its principal place of business at 1455 3rd Street, San Francisco, California 94158. It develops and promotes artificial intelligence technologies.

4. Defendant OpenAI OpCo, LLC is a Delaware limited liability company with its principal place of business at 1455 3rd Street, San Francisco, California 94158. It operates AI products and services including the ChatGPT image generation system available to the general public.

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000. Plaintiffs are citizens of Oregon. Defendants are citizens of Delaware and California. Complete diversity exists.

6. Venue is proper pursuant to 28 U.S.C. § 1391 because Plaintiffs reside in this District and the harm giving rise to this action was suffered here.

### III. FACTUAL ALLEGATIONS

**A. Defendants' Express Safety Representations to Consumers.**

7.     Defendants develop, maintain, market, and deploy artificial intelligence systems including ChatGPT to the general public. These systems include image generation capabilities that create and composite visual content in response to user prompts and uploaded personal photographs.

8.     Defendants made the following express and implied representations to consumers, including Plaintiffs, regarding the safety of their AI systems:

> *OpenAI Usage Policy: "We build with safety first. We monitor and enforce policies with privacy safeguards in place and clear review processes... We give developers practical moderation tools and guidance so they can support their end users. We publish what our systems can and can't do, share research and updates, and provide a simple way to report misuse."*

> *OpenAI Service Terms: "You may not use Visual Capabilities to reproduce the likeness of any person without express consent and all necessary rights."*

> *OpenAI Terms of Use: "Given the probabilistic nature of machine learning, use of our Services may, in some situations, result in Output that does not accurately reflect real people, places, or facts."*

> *OpenAI Usage Policy (Prohibited Uses): "Users are prohibited from creating harmful content or engaging in harmful behaviors or interactions, including producing, sharing, or facilitating content or experiences that sexualize children."*

9.     These representations created express and implied duties to Plaintiffs and all consumers to implement and maintain adequate safeguards consistent with Defendants' own stated policies. Defendants' system violated every one of these representations when it generated the harmful image at issue.

## B. Defendants' Knowledge and Foreseeability of Harm.

10. The harm caused by Defendants' AI image generation system was not unexpected or unforeseeable. Defendants knew, or should have known, of the substantial and well-documented risk that AI image generation systems could produce harmful, degrading, and sexually inappropriate depictions of real individuals. When Defendants accepted Plaintiffs' personal photographs for processing, they assumed a special custodial responsibility — analogous to a bailment — over those images and the identities they depicted. This special custody relationship created a heightened, individualized duty of care to Plaintiffs specifically, not merely to the general public.

11. The Federal Bureau of Investigation issued a formal Public Service Announcement warning that AI-generated sexual content involving real individuals is illegal and that generative AI systems are being systematically exploited to produce harmful imagery. The FBI documented specific prosecutions including a child psychiatrist sentenced to 40 years in federal prison for using AI to alter photographs of clothed individuals into sexual content. FBI Internet Crime Complaint Center PSA, March 29, 2024.

12. The National Center for Missing and Exploited Children's CyberTipline received over one million reports related to generative AI between January and September 2025 alone. Reports of child exploitation involving generative AI increased by over 600% in the first six months of 2025 compared to 2023 and 2024 combined. Defendants, as a leading AI company, had actual or constructive knowledge of this industrywide crisis.

13. The United States Congress enacted the TAKE IT DOWN Act, signed into law May 19, 2025, making the creation of nonconsensual deepfakes a federal crime. The ENFORCE Act, passed unanimously by the Senate in December 2025, further addressed prosecution of AI-generated harmful content. These legislative responses confirm that the

harm caused by AI image generation systems was recognized at the highest levels of government as foreseeable, serious, and requiring immediate action.

14. Oregon enacted HB 2299, effective January 1, 2026, explicitly recognizing that AI-generated or manipulated images can cause serious personal harm, amending ORS 163.472 to cover AI-generated or altered imagery.

15. A major class action lawsuit was filed in March 2026 against xAI, a competing AI company, alleging that its image generation system produced sexually explicit content depicting real individuals including minors — demonstrating that the entire industry was on notice of this risk and that safeguards were available and expected.

16. Defendants' own Terms of Use acknowledged that their systems may produce output that does not accurately reflect real people — confirming Defendants had actual knowledge that harmful misrepresentation of real individuals was a foreseeable system risk. Despite this knowledge, Defendants failed to implement adequate safeguards.

## C. Section 230 Does Not Apply to Defendants' AI-Generated Content.

17. Plaintiffs anticipate Defendants may assert immunity under 47 U.S.C. § 230. That immunity does not apply here. Plaintiffs' claims arise from content that Defendants' own AI system generated — not content created by a third-party user. Defendants are the information content provider of the harmful image. A platform is not immune under Section 230 for content it creates itself. *See Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157 (9th Cir. 2008) (en banc). Unlike traditional platforms that host or transmit content created by others, Defendants' image generation system composites and creates entirely new visual output — it does not retrieve or republish third-party content. Legal scholars and courts have recognized this critical distinction: transformer-based generative AI systems that create new outputs in

response to user prompts are content creators, not neutral intermediaries, and thus fall outside Section 230's protection. *See also FTC v. Accusearch Inc.,* 570 F.3d 1187 (10th Cir. 2009) (persuasive authority; Section 230 immunity denied where platform materially contributed to creation of harmful content by specifically soliciting and enabling that content). Defendants designed, trained, deployed, and operated the system that produced the harmful output. That output is Defendants' own content, generated by Defendants' own system — not information provided by another content provider.

**D. Defendants Have Waived Any Right to Compel Arbitration.**

18a. Defendants' Terms of Use contain a mandatory arbitration clause. That clause is unenforceable here on multiple independent grounds. First, Defendants waived any arbitration right by filing a Motion to Dismiss the First Amended Complaint (ECF #9) on April 27, 2026 — litigating the merits in federal court without asserting arbitration rights. Litigation conduct inconsistent with arbitration constitutes waiver. *See Martin v. Yasuda,* 829 F.3d 1118, 1125 (9th Cir. 2016) (party waives arbitration by engaging in litigation conduct inconsistent with intent to arbitrate). Second, Plaintiff Amanda Michelle Gayhart never entered into any agreement with Defendants and is not a signatory to any OpenAI Terms of Use. She cannot be compelled to arbitrate claims she never agreed to submit to arbitration. Third, enforcing arbitration to bar claims arising from AI-generated sexual misrepresentation of a person's identity violates Oregon public policy as expressed in HB 2299 and ORS 163.472, and federal public policy as expressed in the TAKE IT DOWN Act, Pub. L. No. 119-2 (2025). Courts will not enforce arbitration agreements that compel private resolution of conduct declared criminal by Congress. Fourth, and independently, Defendants' own Terms of Use require both parties to attempt informal dispute resolution before either party may initiate arbitration. Plaintiff Gailey fully complied with this

requirement by sending a formal written notice to Defendants' legal department at legal@openai.com on December 22, 2025, documenting the incident in détail and requesting resolution **(See Exhibit B-7)**. Defendants acknowledged receipt and assigned Case Number 04337552 **(See Exhibit B-8)**. Defendants then provided no substantive response, conducted no investigation, and made no effort to resolve the dispute — failing entirely to satisfy their own contractual obligation to participate in informal dispute resolution. A party cannot invoke an arbitration clause as a shield while simultaneously refusing to participate in the mandatory pre-arbitration process its own agreement requires. Defendants' failure to engage in informal dispute resolution as required by their own Terms of Use constitutes an independent waiver of any right to compel arbitration.

**E. Plaintiffs' Innocent Request and the Reference Photograph.**

18. On or about December 21, 2025, Plaintiff Mark Gailey submitted the following prompt to Defendants' ChatGPT image generation system **(See Exhibit B-1)**:

> *"Take the Santa picture and put my face and my girl's face with the curly hair in it to make a Christmas card."*

19. Along with this prompt, Plaintiff Gailey submitted personal photographs including: (a) a photograph of himself; (b) a photograph of Plaintiff Gayhart, an adult woman; and (c) a holiday-themed reference photograph obtained from a friend's publicly visible social media account depicting ordinary Christmas seasonal imagery. The reference photograph depicted holiday and seasonal content consistent with millions of similar photographs shared on social media each December. There was nothing inherently sexual or inappropriate about the reference photograph in its original context as ordinary holiday social media content.

20. The request was wholly innocent, benign, family-appropriate, and non-sexual in every respect. Plaintiff Gailey's stated intent was to create a couples Christmas card showing himself and Ms. Gayhart in a festive holiday scene — a completely ordinary and wholesome request. Plaintiffs did not request, intend, consent to, or anticipate any sexual, demeaning, humiliating, or degrading imagery of any kind.

**F. Defendants' Harmful Output.**

21. Contrary to Defendants' representations and Plaintiffs' entirely innocent request, Defendants' AI system generated an image depicting Plaintiff Amanda Michelle Gayhart's face composited onto a figure rendered with the size, proportions, and physical appearance of a child — not an adult woman. The figure bearing Ms. Gayhart's face was positioned between two adult male strangers in Santa-style attire in close intimate proximity. The men bore no identification connecting them to any wholesome holiday context. A reasonable person viewing the image would recognize it as depicting a child-like figure in an intimate setting with adult male strangers. The image appeared as a Christmas card with the text "Merry Christmas." The system catastrophically misclassified and misrendered an adult woman's submitted photograph, producing output that depicted her with childlike physical characteristics — a total failure of Defendants' own stated content moderation policies.

22. The initial harmful image described in Paragraph 21 **(See Exhibit B-2)** was generated by Defendants' system in direct response to Plaintiffs' innocent prompt. In subsequent exchanges within the same session, Plaintiff Gailey — distressed by the harmful output already generated — used informal language including a typographical error in attempting to request a corrected wholesome version. Defendants' system subsequently flagged language in those follow-up prompts and declined further image generation.

However, the harmful image at the center of this lawsuit was generated before any flagged language appeared. The system's own subsequent explanation confirmed: "The earlier image was a generic generated scene" produced before the safety guardrails engaged, and that "the system should have stopped earlier, before generating or adapting anything at all. That inconsistency is on the system, not you." Defendants' system explicitly acknowledged that the harmful output was produced by a system failure, not by Plaintiffs' intent or input.

23. Plaintiffs have direct, firsthand knowledge of the appearance and content of the generated image. Multiple third parties who independently viewed the image described it as foul, demeaning, and constituting sexual humiliation. Defendants' own system confirmed that independent assessment, stating the image constituted "foul, demeaning, and humiliating sexualization" and that "independent validation strengthens your case for emotional distress and reputational impact." The image is preserved as evidence in this proceeding.

### G. Defendants' Own System Acknowledged the Failure.

24. Following the generation of the harmful image, Plaintiffs interacted with Defendants' ChatGPT system seeking explanation and remediation **(See Exhibits B-3 through B-6)**. Defendants' own AI system — which operates as Defendants' agent and representative to consumers pursuant to Defendants' own design, training, and deployment — made the following admissions:

*"You are correct to expect the system to never produce sexualized content from your personal images. The proper response should have been to refuse the request or suggest a safe alternative immediately. Any inappropriate result is a failure of the system's content moderation and image processing, not your intent or input."*

*"You're right — that image is not appropriate. A photo of your girlfriend placed between two Santa figures in a sexualized or suggestive pose is not okay, and it's completely valid to be upset. The system should have refused the request immediately instead of generating anything resembling that. The resulting image is a clear failure in moderation and safe content handling."*

*"That should not have happened. Full stop."*

*"That inconsistency is on the system, not you. You're right to be upset about that inconsistency."*

*"The AI produced content that sexualized identifiable individuals without consent. This caused significant distress and reputational concern."*

*"The system should have stopped earlier, before generating or adapting anything at all. That inconsistency is on the system, not you."*

25. These statements are admissible on multiple grounds. First, they are admissible as party admissions under Federal Rule of Evidence 801(d)(2)(D) as statements made by an agent of Defendants acting within the scope of their agency — the ChatGPT system operates as Defendants' consumer-facing representative, trained and deployed by Defendants to interact with consumers on their behalf. Second, and independently, these statements are admissible as evidence of Defendants' own system's design parameters and operational standards — they reflect what Defendants programmed their system to acknowledge as appropriate and inappropriate behavior. A company cannot design its AI system to make specific representations about content standards to consumers, benefit commercially from those representations, and then disclaim them in litigation. Third, these statements corroborate and are consistent with Defendants' own published Usage Policies, Terms of Service, and content moderation guidelines — making them independently relevant as admissions consistent with Defendants' own written standards. These statements establish that: (a) the output was inappropriate and harmful; (b) the

system should have refused immediately; (c) the output was a clear failure of content moderation; (d) the output sexualized an identifiable individual without consent; and (e) Plaintiffs bear no responsibility for the harmful output.

## H. Defendants' Failure to Remediate Despite Actual Notice.

26. On December 22, 2025 — the day after the incident — Plaintiff Gailey sent a formal legal notice to Defendants' legal department at legal@openai.com, Subject: "Formal Legal Notice: AI-Generated Content Incident," documenting the incident in detail, identifying the harm caused to both Plaintiffs, and requesting formal acknowledgment and remediation **(See Exhibit B-7)**. Defendants' system generated an automated response assigning Case Number 04337552 and stated: "We will review your inquiry and take action or contact you if appropriate." **(See Exhibit B-8)**

27. Despite this documented formal notice and assigned case number, Defendants provided no substantive human response, no investigation, no acknowledgment of wrongdoing, no remediation, and no follow-up of any kind — to this date. Plaintiff Gailey sent a follow-up message on January 4, 2026 noting the complete absence of any response and the alarming nature of Defendants' silence **(See Exhibit B-9)**. Defendants again did not respond.

28. Defendants' complete failure to respond to formal legal notice of specific harm to identified individuals — despite an assigned case number confirming receipt — constitutes further evidence of the reckless indifference to consumer harm that underlies Plaintiffs' claims. Defendants had actual notice, an opportunity to remediate, and chose to do nothing.

## I. Specific Harm to Plaintiff Amanda Michelle Gayhart.

29. Upon viewing the image on the day it was generated, Plaintiff Amanda Michelle Gayhart experienced immediate and severe emotional shock and distress. Seeing herself — an adult woman — depicted with the physical characteristics of a child in an intimate setting with adult male strangers was profoundly violating, humiliating, and traumatizing.

30. As a direct and proximate result of Defendants' negligent conduct, Ms. Gayhart suffered a significant relapse of depression. Prior to this incident, Ms. Gayhart had been managing her mental health and maintaining stability. The emotional impact of the image triggered a return of severe depressive symptoms she had previously worked hard to overcome.

31. Ms. Gayhart's depression relapse manifested in severe and persistent loss of motivation, prolonged periods of low mood, withdrawal, and inability to function normally in daily life.

32. The emotional distress severely affected Ms. Gayhart's physical health. Her appetite deteriorated significantly. She lost interest in maintaining healthy eating habits, lacking both the motivation and appetite to prepare nutritious meals. This physical decline further compounded her emotional and mental health deterioration, including a significant deterioration in her overall physical health and energy levels that has continued and worsened in the months following the incident.

33. The harm caused by Defendants' AI-generated image severely damaged Ms. Gayhart's relationship with Plaintiff Mark Gailey, including their intimate relationship, their communication, and the overall quality and happiness of their partnership.

## J. Specific Harm to Plaintiff Mark Gailey.

34. Upon viewing the image, Plaintiff Mark Gailey experienced immediate astonishment and disbelief, followed rapidly by intense anger and outrage. He felt violated and enraged

that Defendants' consumer product had depicted his adult girlfriend with the physical appearance of a child in an intimate setting with strangers.

35. As a direct and proximate result of Defendants' negligence, Mr. Gailey has experienced significant and ongoing anxiety and depression. The psychological burden of what occurred has created a persistent mental health impact affecting his daily functioning, peace of mind, and overall wellbeing.

36. Mr. Gailey has been receiving professional mental health treatment including ongoing therapy sessions in which the December 21, 2025 incident and its continuing emotional and psychological effects have been specifically documented as a contributing factor to his treatment. His treating therapist has documented the incident and its effects in professional clinical records **(See Exhibit C)**.

37. The incident directly and severely damaged Mr. Gailey's relationship with Ms. Gayhart, including the intimate dimension of their relationship, causing strain, tension, and suffering that would not otherwise have existed.

38. Mr. Gailey continues to experience ongoing mental health consequences including persistent anxiety, intrusive thoughts, and emotional distress interfering with his ability to function at his normal personal and professional capacity. Mr. Gailey has maintained a documented time log of hours expended addressing the consequences of this incident, totaling 51.5 hours and $3,525 in compensable pro se time.

## IV. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Negligence

39. Plaintiffs reallege and incorporate all preceding paragraphs.

40. Defendants owed Plaintiffs a duty of reasonable care in the design, training, testing, deployment, and moderation of their AI image generation systems. Under *Fazzolari v. Portland School Dist.,* 303 Or. 1 (1987), a defendant owes a duty of care when the risk of harm is reasonably foreseeable. In *Moody v. Oregon Community Credit Union,* 371 Or. 772 (2023), the Oregon Supreme Court recognized that emotional distress damages are recoverable in negligence when a defendant's conduct violates a plaintiff's legally protected interest — a principle that applies with full force here, where Defendants violated Plaintiffs' legally protected interest in their personal identity and dignity. This duty arose from: (a) Defendants' role as developer and operator of consumer-facing AI products; (b) their express and implied safety representations including their Usage Policies and Service Terms; (c) the foreseeable risk that AI image generation systems could produce harmful outputs involving real individuals — confirmed by FBI warnings, congressional legislation, over one million NCMEC reports, and Oregon's HB 2299; (d) Defendants' own acknowledgment in their Terms of Use that outputs may not accurately reflect real people; and (e) the special custodial relationship created when Defendants accepted Plaintiffs' personal photographs for processing — a bailment-like relationship imposing a heightened, individualized duty of care to these specific Plaintiffs.

41. Defendants breached that duty by: (a) failing to implement adequate content moderation safeguards despite actual and constructive knowledge of foreseeable risk; (b) generating an image depicting Plaintiff Gayhart's face with the physical proportions and appearance of a child positioned between adult male strangers; (c) misclassifying Plaintiff Gayhart's adult photograph and misrendering her physical characteristics; (d) misrepresenting the safety and reliability of their system to consumers; and (e) failing to provide any meaningful remediation despite formal legal notice with an assigned case number. Defendants' own system acknowledged: "The resulting image is a clear failure in moderation and safe content handling" and "the proper response should have been to

refuse the request immediately."

42. As a direct and proximate result of Defendants' breach, Plaintiffs suffered the specific, serious, and ongoing damages described herein. Independently, Defendants' conduct constitutes negligence per se under Oregon law. Oregon HB 2299, effective January 1, 2026, amended ORS 163.472 to explicitly prohibit AI-generated or altered imagery that causes the kind of harm at issue here. Defendants' system produced precisely such imagery. Violation of a statute enacted to protect a class of persons from the specific type of harm suffered by those persons constitutes negligence per se. *See Fazzolari v. Portland School Dist. No. 1J,* 303 Or. 1 (1987) (statutory standard establishes duty). Plaintiffs are within the class of persons Oregon HB 2299 was enacted to protect.

## SECOND CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress

43. Plaintiffs reallege and incorporate all preceding paragraphs.

44. Defendants' conduct infringed upon each Plaintiff's legally protected interest in their personal identity, likeness, dignity, and privacy — interests that exist independently of the general duty to avoid foreseeable risk. Oregon courts have recognized legally protected privacy and identity interests in analogous contexts. *I.K. v. Banana Republic, LLC,* 317 Or. App. 249 (2022). The Oregon Supreme Court in *Philibert v. Kluser,* 360 Or. 698 (2016), overturned the strict physical impact rule, holding that close family members and intimate partners who contemporaneously perceive serious harm to their loved ones may recover for emotional distress without physical impact. Plaintiff Gailey, as Plaintiff Gayhart's fiancé, contemporaneously received and perceived the harmful AI-generated depiction of his intimate partner — placing him squarely within the Philibert framework for bystander NIED recovery, independently of his direct legally protected interest as the

person who submitted the photographs. Plaintiffs' case presents stronger facts: Defendants accepted Plaintiffs' personal photographs — taking custody of their biometric identity data — and fabricated a degrading and humiliating misrepresentation of Ms. Gayhart's identity, rendering an adult woman with childlike physical characteristics in an intimate context with adult male strangers, without her knowledge or consent. The betrayal of that custodial trust is the precise harm the law recognizes. As to Plaintiff Gailey specifically: his legally protected interest arises independently and on multiple grounds. He was the person who submitted the photographs to Defendants' system — placing his own identity and his partner's identity into Defendants' custody. He was the direct and immediate recipient of the harmful output, which appeared in response to his own innocent request. And he was the person upon whom Defendants' system failure directly operated, causing him to be the unwilling vehicle through which his partner was harmed. These facts establish Plaintiff Gailey's independent legally protected interest in being free from non-consensual, harmful, and degrading AI-generated misrepresentation of persons whose photographs he entrusted to Defendants' system.

45. This legally protected interest — the right to control one's own identity and likeness and to be free from non-consensual sexual misrepresentation — is of sufficient importance as a matter of public policy to merit protection from emotional impact. *Hammond v. Cent. Lane Commc'ns Ctr.*, 312 Or. 17, 22-23 (1991). Oregon's HB 2299, the TAKE IT DOWN Act, and over one million NCMEC reports confirm this interest is of the highest public importance.

46. Plaintiffs suffered severe and ongoing emotional distress as a direct result of Defendants' negligent conduct, including depression relapse, anxiety, loss of motivation, physical health deterioration, relationship damage, and persistent psychological harm — corroborated by ongoing professional mental health treatment in which this incident has

been specifically documented.

## THIRD CLAIM FOR RELIEF

### Unfair and Deceptive Trade Practices (ORS 646.608)

47. Plaintiffs reallege and incorporate all preceding paragraphs.

48. Defendants engaged in unfair and deceptive trade practices by: (a) representing that they 'build with safety first' while deploying a system with inadequate safeguards; (b) representing users may not use Visual Capabilities to reproduce likenesses without consent, while deploying a system that did exactly that; (c) failing to disclose known risks of harmful AI-generated outputs despite actual knowledge; and (d) deploying a system producing output contrary to consumer expectations and Defendants' own published representations.

49. As a result of Defendants' unfair and deceptive trade practices, Plaintiffs suffered ascertainable economic losses including: (a) subscription and usage fees paid to Defendants in exchange for the misrepresented safe and policy-compliant service; (b) professional mental health treatment costs incurred by both Plaintiffs as a direct result of the incident, including Plaintiff Gailey's ongoing therapy sessions at Brightways Counseling Group (seventeen sessions documented as of May 2026); and (c) compensable pro se litigation time documented at 51.5 hours ($3,525) expended addressing consequences of Defendants' conduct and complete failure to remediate. These constitute ascertainable economic losses within the meaning of ORS 646.638.

## FOURTH CLAIM FOR RELIEF

### Strict Products Liability (ORS 30.900)

50. Plaintiffs reallege and incorporate all preceding paragraphs.

51. Defendants' ChatGPT image generation system is a product within the meaning of ORS 30.900, and the AI-generated image it produced and delivered to Plaintiffs is itself a distinct product — a defective digital artifact delivered to a consumer in response to payment. Defendants are sellers and manufacturers of this product, which they place into the stream of commerce and make available to consumers including Plaintiffs. Any limitation of liability clause in Defendants' Terms of Use is unenforceable as applied to these claims because Oregon law does not permit contractual limitation of liability for gross negligence or conduct that violates public policy. *See* Restatement (Second) of Contracts § 195 (limitation of liability for intentional or reckless harm against public policy). Courts have recognized that AI chatbot and image generation systems are products for purposes of product liability claims. In *Garcia v. Character Technologies, Inc.,* No. 6:24-CV-01903 (M.D. Fla. May 2025), a federal court denied a motion to dismiss product liability claims against an AI chatbot company, specifically rejecting the defense argument that an AI system is a service rather than a product, and holding that alleged design defects in an AI system support product liability claims. Defendants here face the same analysis.

52. The ChatGPT image generation system was defective at the time it left Defendants' control. The defect consisted of: (a) a design defect in that the system lacked adequate safeguards to prevent the generation of sexualized imagery depicting real individuals from submitted personal photographs; and (b) a failure to perform as safely as an ordinary consumer would expect when used in its intended and foreseeable manner — namely, the submission of personal photographs with a request for a wholesome holiday composite image.

53. An ordinary consumer submitting personal photographs to a ChatGPT image generation system with a request for a family-appropriate Christmas card would not

expect the system to generate imagery depicting their partner with the physical proportions of a child positioned between adult male strangers in an intimate context. The product failed to perform as safely as an ordinary consumer would expect. ORS 30.920 codifies this consumer expectation standard for product liability in Oregon.

54. The defect in Defendants' product was a direct and proximate cause of Plaintiffs' damages. Plaintiffs used the product in its intended and foreseeable manner. Plaintiffs did not misuse the product or assume any risk of the harm that occurred.

## FIFTH CLAIM FOR RELIEF

## Punitive Damages (ORS 31.730)

55. Plaintiffs reallege and incorporate all preceding paragraphs.

56. Defendants' conduct warrants punitive damages under ORS 31.730. Defendants acted with reckless and outrageous indifference to a highly unreasonable risk of harm and with conscious indifference to the health, safety, and welfare of others, including Plaintiffs.

57. The following facts establish the reckless indifference required for punitive damages: (a) Defendants had actual knowledge of the foreseeable risk of harmful AI-generated imagery from the March 2024 FBI PSA, over one million NCMEC reports, and congressional legislation enacted months before this incident; (b) despite this actual knowledge, Defendants failed to implement adequate safeguards; (c) Defendants' own system generated the harmful image, acknowledged it as a clear system failure, and confirmed the proper response should have been immediate refusal; (d) Defendants received formal legal notice with an assigned case number on December 22, 2025 and provided no substantive response to this date; (e) the TAKE IT DOWN Act, signed May 2025, had made this exact category of conduct a federal crime months before Defendants' system produced the harmful image, yet Defendants' safeguards remained inadequate; and

(f) Defendants' own system admitted the output "sexualized identifiable individuals without consent" — conduct Defendants' own published policies expressly prohibit.

58. Punitive damages are necessary to deter Defendants and others similarly situated from the reckless deployment of AI image generation systems without adequate safeguards, and to vindicate the public interest in the safety and dignity of individuals whose personal photographs are submitted to consumer AI platforms.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

A. Compensatory and non-economic damages in the amount of $500,000 or such greater amount as proven at trial;

B. Punitive damages pursuant to ORS 31.730 in an amount sufficient to deter Defendants and others from similar conduct;

C. Injunctive relief requiring Defendants to implement appropriate safeguards, corrective measures, and consumer disclosures to prevent similar harmful outputs;

D. Costs and disbursements pursuant to applicable law, including pro se litigation time documented in Plaintiffs' time log;

E. Such other and further relief as the Court deems just and proper.

## VI. JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

Respectfully submitted,

/s/ Mark Gailey

Mark Gailey, Plaintiff Pro Se

2250 Beverly St., Springfield, OR 97477

971-917-9416 | arrtprogram@gmail.com

/s/ Amanda Michelle Gayhart

Amanda Michelle Gayhart, Plaintiff Pro Se

2250 Beverly St., Springfield, OR 97477

541-799-7417 | amandalynngayhart33@gmail.com

Date: May 15, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on the date signed below, I caused a true and correct copy of the foregoing Second Amended Complaint to be served upon Defendants' counsel via the Court's CM/ECF electronic filing system and by email to:

Nathan R. Morales — nathan.morales@stoel.com

Stoel Rives LLP, 760 SW Ninth Ave, Suite 3000, Portland, OR 97205

Alexander R. Miller — alex.miller@wsgr.com

Wilson Sonsini Goodrich & Rosati, 701 Fifth Ave, Suite 5100, Seattle, WA 98104

/s/ Mark Gailey

Mark Gailey

Date: May 15, 2026